IN THE MATTER OF THE PETITION OF AH HO, AH KAI, AH SAI, a minor, SEU CHOY, LEONG SAM, LOO WAI, TAM SEE, AH PIN, WONG HOOK and LEE GIT FOR A WRIT OF HABEAS CORPUS.

IN THE MATTER OF THE PETITION OF LEONG HUNG and AH LAU FOR A WRIT OF HABEAS CORPUS.

IN THE MATTER OF THE PETITION OF AH KUNG, CHUN SEE and CHUN KIN FOR A WRIT OF HABEAS CORPUS.

IN THE MATTER OF THE PETITION OF NG MAN HIN, WONG MAN SING, LUM SAI, YEE SING, YEE HO, KAM LOY, YEE FON, HEE YOUNG, CHANG HOP, AH YIP, LEE KUN, MAK TAI, LUKE KAT, KO SAM, LAM LOOK, and LEE YEE FOR A WRIT OF HABEAS CORPUS.

IN THE MATTER OF THE PETITION OF WONG HING KONG, CHANG SHEE (wife of Wong Hing Kong), and a minor daughter, MARY DOE, WONG KAI, CHANG KING ON, WONG TUCK, YUEN CHEW, JA KUM YOW, SEE KONG SING and KAM PONG FOR A WRIT OF HABEAS CORPUS.

IN THE MATTER OF THE PETITION OF LEONG LOCK YEE, YEE LIN KWAI, LEE SING, LOO UNG, LUM CHEE, CHANG TOW, Y. AE, CHAN HOW, WONG MANG LEONG, PONG BUNG, AH KI, CHAN SHEE, AH YOU, AU HIM, LUKE SHEE, and LUM SHING FOR A WRIT OF HABEAS CORPUS.

IN THE MATTER OF THE PETITION OF NIP CHOCK NAM, MOCK GIP LAU, HA CHUN, HA YOOK, HA SAU, NG PAK SUI, LEE LIN, LUM SUI LEONG, CHUN CHOW, LEE NIP, NG FON ON, NG SEE, NG QUON, NG FAI, NG CHAN, NG CHOW, NG GON, NG YIN, NG YIN, NG CHOW, NG YUEN, NG CHEE, NG FO, and NG HIM FOR A WRIT OF HABEAS CORPUS.

IN THE MATTER OF THE PETITION OF KON SOW, LEE LING, LAM CHEW, LOO LUNG, YOUNG SAM, LEE TAI, YOUNG MEI, KIM NGA, CHUN HING, TANG LIM, AU KAI, CHIM WA, LIK SUM, LEE LIM, MAY DAY LIN, NG FONG OUG, NG FAI, NG YUN, NG LIN, NG YAN, CHAN T. LANG, PANG KEM PUNG, PANG SI YEN, PAN KAM, MOON SAM, HIP CHUCK NAM, HA CHANE, AU YOUNG, YAN LIN, CHIN KUM, WANG HUNG KONG, CHANG FUN, TONG MONG, LEE PAT, LAN SUM LAI, KWONG SING, YEN KUOI, UN LIN FAT,

KIM YUM, KA KEN, CHA HO, WONG TUCK, AKANA, AU YEW, MOON SUM, LEE HO, NG CHIE, NG CHAN, NG YEN, NG CHEW, CHIN HAN, WONG CHUN, PANG SAM, PANG PUNG, YOUNG DAI, YOUNG DAI, YOUNG KEE, HA CHAN, NG PAK SAY, YAN LAN, YOUNG YAT HUNG, WONG KAI, CHANG SHI, YOUNG YEN FONG, YONG YEW, PANG SHA SHE, LEONG LOCK YEN, LAU AKANA, YOUNG CHONG, LEE SAM, YOUNG SAM, KINI DAI, PAU SIK, TONG MUN, YUEN CHOW, AU KI, AU HING, CHUN YOUNG SUN, CHAN FAN, NG KWONG, NG FAN, NG SHE, NG FOO, LUM SING, CHAN YUK SAM, PANG SUN, PANG KUN HOP, MANG HING, CHANG KING ON, HA YUK, LUM LAY LEONG, LUM SHE (w), AH YOUNG, YOUNG E. CHANG TWO, TSE KONG WAM WONG NIM, YUEN MONG LEONG, YOUNG CHEONG, BOW LACK, alias TAM KWOCK YEE, CHUN SEE (w), and son FOR A WRIT OF HABEAS CORPUS.

ORIGINAL.

SUBMITTED JANUARY 12, 1899.     DECIDED JANUARY 18, 1899.

JUDD, C.J., WHITING, J., AND CIRCUIT JUDGE PERRY, IN PLACE OF FREAR, J., ABSENT.

This Court has jurisdiction, in habeas corpus proceedings brought to inquire into the legality of the detention of the petitioners, to construe the United States laws relating to the immigration and exclusion of Chinese, which laws have been extended to these Islands, and to pass upon the validity of the appointment of an officer claiming to act under such laws and the extent of his powers thereunder.

The decision *in re 'Wong Tuck* and others, *ante* p. 600, in so far as it holds to the contrary, reversed.

The Collector-General of Customs of the Hawaiian Islands still has authority to prevent the landing on these shores of Chinese who are prohibited by existing laws from landing.

OPINION OF THE COURT BY CIRCUIT JUDGE PERRY.

The petitioners in the above entitled cases are all Chinese and seek to enter the Hawaiian Islands under the same circumstances as did the petitioners in the cases of *Wong Tuck* and others, recently decided by this Court, *ante* page 600. Upon the refusal of the respondent and of J. K. Brown, Chinese Inspector sent here by the Secretary of the Treasury of the United States, to allow them to land, these petitions were filed and writs issued. The pleadings are all similar in form and substance to those in the *Wong Tuck* case, and present the same questions of law.

In the cases referred to, this Court held that by the terms of the Newlands Resolution "the United States laws relating to the immigration and exclusion of Chinese were extended to and put in force in the Hawaiian Islands and are now in force in this country; and, further, that Chinese, whether residing in this country or not prior to July 7, 1898, to whom permits to enter the Hawaiian Islands were issued prior to said date by the Hawaiian Government, are not excepted by the Resolution from the operation of said United States laws, but are also subject to the provisions thereof." To the views expressed and conclusion reached on that branch of the decision in those cases, we adhere.

On the question of whether or not this Court has jurisdiction "in habeas corpus proceedings or otherwise to pass upon the validity of the appointment of a Federal officer or the extent of his powers under Federal laws or the legality of the detention by him under such laws of persons who claim to be illegally in such custody," further argument was presented in the cases

at bar and the attention of the Court directed to controlling
decisions of the Supreme Court of the United States. On a
careful re-examination of the subject, with the additional light
thus given, we believe that the conclusion reached by the ma-
jority of the Court in the *Wong Tuck* case on this question of
jurisdiction, was not founded on a correct view of the law and
that it should be reversed.

The Hawaiian Islands are now a part of the territory of the
United States. There are no two separate sovereignties here,
such as exist in each of the States, within the meaning of the
rules laid down in the *Booth* cases, 21 Howard 506. The de-
cision in those cases is not, therefore, in point.

The Supreme Court of the United States has held, more-
over, that the provisions of Sections 1 and 2, Art. III. of the
Constitution, that "the judicial power of the United States shall
be vested in one Supreme Court and in such inferior Courts as
Congress may, from time to time, order and establish," and
that, "the judicial power shall extend to all cases in law and
equity arising under this Constitution, the laws of the United
States, and treaties made, or which shall be made, under their
authority, · * * * to all cases of admiralty and maritime
jurisdiction" do not prohibit Congress from itself establishing
or from delegating to a territorial legislature the power to es-
tablish, Courts in such territories which are not "inferior"
Courts such as are contemplated by Article III. but which
nevertheless have the same jurisdiction in all cases arising under
the Constitution and laws of the United States as is vested in
the Circuit and District Courts of the United States, i. e., in
the "inferior" Courts; and that the source of the power of Con-
gress thus to establish, either directly or indirectly, such tri-
bunals, is Article IV., Section 3, of the Constitution, which
provides that "the Congress shall have power to dispose of and
make all needful rules and regulations respecting the territory
or other property belonging to the United States." In other
words, that Court has held that it is not inconsistent with the
Constitution of the United States, or unconstitutional, for terri-

torial Courts, when authorized so to do by Congress, either directly or indirectly, to exercise the judicial powers named in Art. III., even though such courts be not "inferior" Courts within the meaning of that Article. In this respect, Territorial Courts stand on a different basis from State Courts.

The following authorities abundantly sustain the foregoing propositions:

In *American Ins. Co. v. Canter*, 1 Peters 511, 542, 546, decided in 1828, the question was "as to the validity of a decree passed by a Court, consisting of a notary and five jurors, created by a statute of the territorial legislature of Florida, whose powers, under certain Acts of Congress, extended to all rightful subjects of legislation, subject to the restriction that their laws should not be inconsistent with the laws and Constitution of the United States. On one side it was contended, that, under those acts, jurisdiction was vested exclusively in the superior Courts of the territory created by the Acts of Congress establishing a territorial government in Florida" (171 U. S. 180). The Court said: "In the meantime," (i. e. until it shall become a state) "Florida continues to be a territory of the United States; governed by virtue of that clause in the Constitution which empowers Congress 'to make all needful rules and regulations, respecting the territory or other property belonging to the United States.' * * *

"It has been contended, that by the Constitution the judicial power of the United States extends to all cases of admiralty and maritime jurisdiction; and that the whole of this judicial power must be vested 'in one Supreme Court, and in such inferior Courts as Congress shall from time to time ordain and establish.' Hence it has been argued, that Congress cannot vest admiralty jurisdiction in Courts created by the territorial legislature.

"We have only to pursue this subject one step further, to perceive that this provision of the Constitution does not apply to it. The next sentence declares, that 'the judges both of the

Supreme and inferior Courts, shall hold their offices during good behavior.' The judges of the superior Courts of Florida hold their offices for four years. These Courts, then, are not constitutional Courts, in which the judicial power conferred by the Constitution on the general government, can be deposited. They are incapable of receiving it. They are legislative Courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States. The jurisdiction with which they are invested, is not a part of that judicial power which is defined in the 3rd Article of the Constitution, but is conferred by Congress in the execution of those general powers which that body possesses over the territories of the United States. Although admiralty jurisdiction can be exercised in the States in those Courts, only, which are established in pursuance of the 3rd Article of the Constitution, the same limitation does not extend to the territories. In legislating for them, Congress exercises the combined powers of the general, and of a state government.

"We think, then, that the Act of the territorial legislature, erecting the Court by whose decree the cargo of the Point a Petre was sold, is not 'inconsistent with the laws and Constitution of the United States,' and is valid."

In 1849, after the admission of Florida as a State, further questions of jurisdiction arose there and were decided in *Benner v. Porter*, 9 Howard 235 (18 Curtis 121). In that case, the Court said:

"The distinction between the Federal and State jurisdiction, under the Constitution of the United States, has no foundation in these territorial governments; and consequently, no such distinction exists, either in respect to the jurisdiction of their Courts or the subjects submitted to their cognizance. They are legislative governments, and their Courts legislative Courts; Congress, in the exercise of its powers in the organization and government of the territories, combining the powers of both

IN RE AH HO, et al.                    661


the Federal and State authorities. There is but one system of government, or of laws operating within their limits, as neither is subject to the constitutional provisions in respect to State and Federal jurisdiction.

"They are not organized under the Constitution, nor subject to its complex distribution of the powers of government, as the organic law; but are the creations, exclusively, of the legislative department, and subject to its supervision and control. Whether or not there are provisions in that instrument which extend to and act upon these territorial governments, it is not now material to examine. We are speaking here of those provisions that refer particularly to the distinction between Federal and State jurisdiction.     *     *     *

"The admission of the State into the Union brought the territory under the full and complete operation of the Federal Constitution, and the judicial power of the Union could be exercised only in conformity to the provisions of that instrument. By Art. III., Section 1: 'The judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as Congress may, from time to time, ordain and establish. The judges, both of the Supreme and inferior Courts, shall hold their offices during good behavior.'

"Congress must not only ordain and establish inferior Courts within a State, and prescribe their jurisdiction, but the judges appointed to administer them must possess the constitutional tenure of office before they can become invested with any portion of the judicial power of the Union. There is no exception to this rule in the Constitution. The territorial Courts, therefore, were not Courts in which the judicial power conferred by the Constitution of the Federal Government could be deposited. They were incapable of receiving it, as the tenure of the incumbents was but four years. 1 Pet. 546. Neither were they organized by Congress under the Constitution, as they were invested with powers and jurisdiction which that body were incapable of conferring upon a Court within the limits of a State."

In *Clinton v. Englebrecht*, 13 Wall. 447, (1871) the two cases just cited were approved, the Court saying:

"The judges of the Supreme Court of the Territory are appointed by the President under the Act of Congress, but this does not make the Courts they are authorized to hold Courts of the United States. This was decided long since in *The American Insurance Company v. Canter*, and in the later case of *Benner v. Porter*. There is nothing in the Constitution which would prevent Congress from conferring the jurisdiction which they exercise, if the judges were elected by the people of the Territory, and commissioned by the governor. They might be clothed with the same authority to decide all cases arising under the Constitution and laws of the United States, subject to the same revision. Indeed, it can hardly be supposed that the earliest Territorial Courts did not decide such questions, although there was no express provision to that effect, as we have already seen, until a comparatively recent period.

"There is no Supreme Court of the United States, nor is there any District Court of the United States, in the sense of the Constitution, in the Territory of Utah. The judges are not appointed for the same terms, nor is the jurisdiction which they exercise part of the judicial power conferred by the Constitution or the General Government. The Courts are the Legislative Courts of the Territory, created in virtue of the clause which authorizes Congress to make all needful rules and regulations respecting the Territories belonging to the United States."

Again, in *Reynolds v. U. S.*, 98 U. S. 154, (1878):

"By. Sec. 1910 of the Revised Statutes the District Courts of the Territory have the same jurisdiction in all cases arising under the Constitution and laws of the United States as is vested in the Circuit and District Courts of the United States; but this does not make them Circuit and District Courts of the United States. We have often so decided. *American Insurance Co. v. Canter*, 1 Pet. 511; *Benner et al. v. Porter*, 9 How. 235; *Clinton v. Englebrecht*, 13 Wall. 434. They are Courts of the

Territories, invested for some purposes with the powers of the
Courts of the United States."

The Act of Congress approved March 2, 1853, entitled "An
Act to establish the Territorial Government of Washington,"
enacted "that the District Courts of the Territory shall have
and exercise the same jurisdiction in all cases arising under the
Constitution and laws of the United States as is vested in the
Circuit and District Courts of the United States, and also of all
cases arising under the laws of the Territory. In the case of
"*The City of Panama*," 101 U. S. 453 (1879), a libel in rem
against a steamship was filed in the proper District Court of the
Territory. The jurisdiction of the Court was attacked by the
respondents, "admiralty and maratime" cases being one of the
subjects apparently reserved by Art. III. to the Supreme and
"Inferior" Courts there referred to. In disposing of the ques-
tions raised, it was said, inter alia: "Beyond all question ad-
miralty jurisdiction, including jurisdiction in prize cases, was
vested in the Territorial District Courts by the ninth Section
of the organic act, the explicit language of the act being that
the District Courts of the Territory shall have and exercise the
same jurisdiction in all cases arising under the Constitution and
laws of the United States, as is vested in the Circuit and Dis-
trict Courts of the United States, and also of all cases arising
under the laws of the Territory.   *   *   *

"State Courts have no jurisdiction in admiralty cases, nor
can Courts within the States exercise such jurisdiction, except
such as are established in pursuance of the third Article of the
Constitution, but this Court in that case," (*American Insur-
ance Co. v. Canter*) "Mr. Chief Justice Marshall giving the
opinion, decided expressly that the same limitation does not
extend to the Territories; that in legislating for the Territories,
Congress exercises the unlimited powers of the General and of
a State government.   *   *   *

"Instances where such jurisdiction," i. e., of cases arising
under the Constitution and laws of the United States, "has
been exercised by the Territorial District Courts under such

JANUARY, 1899.

acts are numerous, and they extend from the time our territorial system was organized to the present time, and the power has always been exercised without challenge from any quarter and without the least doubt of their constitutional or legal authority."

"It is certainly now too late to doubt the power of Congress to govern the Territories. There have been some differences of opinion as to the particular clause of the Constitution from which the power is derived, but that it exists has always been conceded. * * * All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress. The Territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States, and Congress may legislate for them as a State does for its municipal organizations. The organic law of a Territory takes the place of a Constitution as the fundamental law of the local government. It is obligatory on and binds the territorial authorities; but Congress is supreme, and for the purpose of this department of its governmental authority has all the powers of the people of the United States, except such as have been expressly or by implication reserved in the prohibitions of the Constitution." *National Bank v. County of Yankton*, 101 U. S. 133 (1879).

It being, then, clearly shown by these decisions that Congress can, constitutionally, establish Courts in the Territories with jurisdiction over cases arising under the laws of the United States, even though such Courts be other than those contemplated in Art. III., and can likewise delegate to a Territorial Legislature the power to establish such tribunals, it remains to be considered what power, if any, Congress has in the exercise of that authority conferred on this Court.

In the Joint Resolution of July 7, 1898, it is provided that "until Congress shall provide for the government of such islands, all the civil, judicial and military powers exercised by the

officers of the existing government in said islands, shall be vested in such person or persons, and shall be exercised in such manner as the President of the United States shall direct; and the President shall have power to remove said officers and fill the vacancies so occasioned;" and, further, that "the municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this Joint Resolution, nor contrary to the Constitution of the United States, nor to any existing treaty of the United States, shall remain in force until the Congress of the United States shall otherwise determine." In the exercise of the power conferred by the first of these two provisions, the President of the United States, on August 12, 1898, directed, by proclamation, that "the civil, judicial and military powers in question shall be exercised by the officers of the Republic of Hawaii, as it existed just prior to the transfer of sovereignty, subject to his power to remove such officers and to fill vacancies," and after reiterating the second of these and other provisions of the Resolution, further directed that, "under these various provisions, the Government of the islands will proceed without interruption." The intention of Congress was to continue the existing government of the islands in operation without interruption, except in so far as it might be inconsistent with the Constitution or treaties of the United States or with the terms of the Resolution. Subject to this limitation only, the judicial power was to continue as it existed just prior to the transfer of sovereignty.

Article 82 of the Constitution of Hawaii vested the judicial power of the Republic in one Supreme Court and in such inferior Courts as the Legislature might, from time to time, establish; and Article 85 provided: "The judicial power shall extend to all cases in law and equity, arising under the Constitution and Laws of the Republic, and Treaties; to all cases affecting Public Ministers and Consuls, and to all cases of Admiralty and Maritime Jurisdiction." Under our laws (see Section 51 of the Judiciary Act of 1892) the Supreme Court had the power to issue writs of habeas corpus and to inquire into the legality

of the restraint in any and all cases of alleged illegal detention, without any limitation whatever. That power thus granted by our own Legislature, Congress has confirmed and validated,— the equivalent of a new grant to the same extent—in and by the Newlands Resolution. If, in inquiring into the legality of the restraint in this case, it becomes necessary incidentally to construe the United States laws relating to the immigration and exclusion of Chinese, which laws have been extended here, or to pass upon the validity of the appointment of an officer claiming to act under such laws or the extent of his powers thereunder, this Court has, we now believe, the jurisdiction to do so. Neither the exercise of such jurisdiction by the Court, nor the grant or confirmation thereof by Congress, is, as has been seen, inconsistent with the Constitution of the United States.

In the cases of *Wong Tuck* and others, the question of the extent of the powers of Inspector J. K. Brown and of the respondent McStocker, was not definitely decided, although discussed to some extent. We go now one step further, and say that in our opinion the respondent McStocker has authority to prevent the landing upon the shores of these islands of Chinese who are by law prohibited from landing. He had, just prior to the transfer of sovereignty, this authority under Hawaiian laws which are not inconsistent with the terms of the Resolution or with the Constitution of the United States. By the terms of the Resolution, therefore, that authority is continued in him. The Court holding, as does the respondent McStocker, that under existing laws these petitioners are prohibited from entering these islands, it becomes unnecessary to express an opinion on the question of whether or not said respondent's decision in this case or in similar cases is final and not reviewable by this Court.

For these reasons, we think that the detention in these cases by respondent McStocker is lawful, that the writs issued herein should be discharged and that the petitioners should be remanded to the custody of said respondent.

*Robertson & Wilder, J. A. Magoon* and *R. D. Silliman, J.*

*M. Davidson, Humphreys & Gear,* and *Kinney, Ballou & Mc-Clanahan,* for petitioners.

*W. O. Smith, Attorney-General,* and *Thurston & Carter,* for respondent.

OPINION OF JUDD, C.J.

While I respectfully dissent from the opinion of the majority of the Court that the writs in these cases should be discharged, I agree with and concur in the opinion on the question of our jurisdiction.